# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **TAMMY L. ARNOLD,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION FILE NO.** |
| | : | |
| **MICHAEL J. ASTRUE,** | : | **1:08-CV-1747-AJB** |
| *Commissioner of Social* | : | |
| *Security Administration*, | : | |
| | : | |
| **Defendant.** | : | |

## O R D E R   A N D   O P I N I O N[1]

Plaintiff Tammy L. Arnold brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her application for Supplemental Security Income ("SSI").[2] For the reasons set forth below, the undersigned **ORDERS** that the decision of the Commissioner be **AFFIRMED**.

---

[1] The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. [*See* Dkt. Entry dated 7/08/2008]. Therefore, this Order constitutes a final Order of the Court.

[2] Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, provides for supplemental security income for the disabled. Title XVI claims are not tied to the attainment of a particular period of insurance eligibility. *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).

# I.    PROCEDURAL HISTORY

Plaintiff filed an application for Supplemental Security Income ("SSI") on January 5, 1999, alleging disability commencing on August 1, 1997. [Record (hereinafter "R") 57]. The claim was denied on March 10, 1999, and Plaintiff filed a request for reconsideration on March 11, 1999. [R39-42]. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). [R42]. Evidentiary hearings were held on September 23, 1999, and June 20, 2000, [R621-91], which resulted in a "Notice of Decision-Unfavorable," dated February 8, 2001, denying Plaintiff's claim on the grounds that she retained the Residual Functional Capacity ("RFC") to perform light work with limited bending, stooping, twisting, and with a sit/stand option. [R221-33]. Plaintiff requested review by the Appeals Council which, on July 11, 2002, granted Plaintiff's request for review, and vacated and remanded the claim back to the ALJ for further proceedings. [R239-41].

Plaintiff filed another application for SSI benefits on February 22, 2001, and was found to be disabled as of February 9, 2001. [R20].

The ALJ held another hearing on December 4, 2006, [R692-723], which resulted in "Notice of Decision-Unfavorable," dated July 23, 2007, denying Plaintiff's claim on the grounds that she retained the RFC to perform her past relevant work as well as other

work that exists in the national economy.  [R17-29].  Plaintiff requested review by the Appeals Council, which denied review, making the ALJ's decision the final decision of the Commissioner.  [R11-13, 16].

Plaintiff, having exhausted all administrative remedies, filed this action on May 7, 2008.  [Doc. 2].  The Commissioner filed the transcript of the administrative proceedings on December 1, 2008.  [Doc. 7].  The matter is now before the undersigned upon the administrative record, the parties' pleadings, briefs and oral argument, and is ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).[3]

## II.     PLAINTIFF'S CONTENTIONS

As set forth in Plaintiff's brief, the issue to be decided is as follows:

1.      Whether the Administrative Law Judge erred by not finding that Ms. Arnold met listing 12.05 C.

[Doc. 11 at 1].

## III.    STATEMENT OF FACTS

### A.     *Factual Background*

Plaintiff was born on March 29, 1963, and was 43 years old at the time of the administrative evidentiary hearing.  [R57].  She has an eleventh grade education.  [R67,

---

[3]      The parties agree that the present suit only deals with the time period of January 6, 1999, through February 8, 2001.  [R20, Docs. 11 at 3 and 12 at 2].

3

AO 72A
(Rev.8/8
2)

699-700] . Her past relevant work was as a housekeeper, packer, mail sorter, garment hanger, and day care worker.  [R62, 84-86, 252, 716-717].

   B.   *Medical Records*

The medical evidence is comprised of records from (1) Dr. D. Hall Silcox, III; (2) Dr. Phillip G. Wiltz, Jr.; (3) South Central Mental Health Center; (4) Dr. Douglas F. Powell; (5) Dr. Eugene Emory; (6) Georgia Baptist Medical Center; (7) Southside Healthcare, Inc.; (8) Carla A. Hedeen, Ph.D.; (9) South Central Mental Health; (10) Clifton Springs; (11) Dr. Margo King; (12) DeKalb Community Service Board; (13) Total Health Medical Center; (14) Dr. Russell E. Brown, and (15) Dr. Leslie Harvey.[4]

Review of these records discloses that on July 27, 1999, Plaintiff received treatment at South Central Mental Health for anxiety and depression. [R109-10]. Plaintiff reported that she had six children, three of whom also had children, and that she cared for all of them.  [R109].  Plaintiff also reported she attended school until the eleventh grade, when she dropped out because she became pregnant.  [R109, 118]. Plaintiff indicated that she would like to attend a GED course to complete her

---

   [4]   Because Plaintiff does not contest the ALJ's findings regarding her physical impairments, [Doc. 11 at 16-17], the Court will summarize only the evidence that relates to Plaintiff's mental condition.

AO 72A
(Rev.8/8
2)

education, but she showed little interest.  [R118].  She denied any hallucinations or

suicidal ideation.  [R110, 118].  Plaintiff was diagnosed with a depressive disorder and

an anxiety disorder and given a Global Assessment of Function (GAF) score of 70 to

80.[5]  [R110].  The examiner specifically stated that Plaintiff's "Presenting Problem <u>is

Not</u> a Disability."  [R110 (emphasis in original)].

From July 27 through September 9, 1999, Plaintiff attended both group therapy

and individual counseling. [R107-108].  She continued to report anxiety and depression

due to her family situation.  [*Id*.].  The therapy focused on helping Plaintiff re-stabilize

control in her home and obtaining better coping skills to deal with her

problems.  [R108].  Plaintiff reported feeling better after her first group session, but she

did not return for treatment.  [R107].

On March 7, 2000, Plaintiff underwent a psychological evaluation with

Dr. Eugene Emory due to a diagnosis of cognitive disorder, NOS, and major depressive

_____

[5]        A GAF score of 70 indicates some mild symptoms (e.g., depressed mood
and mild insomnia) or some difficulty in social, occupational, or school functioning
(e.g., occasionally truancy, or theft within the household), but generally functioning
pretty well, has some meaningful interpersonal relationships.  A GAF score of 80
indicates that if symptoms are present, they are transient and expectable reactions to
psycho-social stressors (e.g., difficulty concentrating after family argument; no more
than slight impairment in social, occupational, or school functioning (e.g., temporarily
falling behind in school work).  American Psychiatric Association, *Diagnostic and
Statistical Manual of Mental Disorders*, 34 (4th Ed. Text Rev. 2000).

AO 72A
(Rev.8/8
2)

disorder, moderate without psychotic features. [R129]. Dr. Emory noted that Plaintiff

had the following functional capabilities that are substantially limited due to disability:

decision making problems, concentration, math calculations, ability to read or write,

conceptualization problems, visual motor skills, difficulty with frequent changes of

flexibility, and abstract thinking. [*Id.*]. Plaintiff's Full Scale IQ score on the K-Bit test

was noted to be 54 +/- 8, which was considered to be in the lower extreme category.

[*Id.*]. On the WRAT-3, Plaintiff's reading level was a third grade, spelling second

grade, and math skills third grade. [*Id.*]. Dr. Emory determined that some remediation

was possible for Plaintiff's disability:

> Ms. Arnold's remediation may be limited given her low I-Q & impaired
> achievement. She might benefit from vocational and possibly Cognitive
> Rehabilitation, her depression should be treated. Likely through
> Psychotherapy and possibly medication.

[R130].

On July 31, 2000, Plaintiff was seen at South Central Mental Health for

depression. [R180-93]. Plaintiff reported she went to school through the eleventh

grade and stopped when she had her first child. [R187]. The examiners noted that

Plaintiff had a depressed affect and mood and reported difficulty with her short-term

memory, but they also noted she was fully oriented and had logical thought processes

6

and appropriate thought content with no delusions or hallucinations. [R191-92]. Plaintiff was diagnosed with major depressive disorder and given a GAF score of 40.[6]

On August 14, 2000, Plaintiff visited Carla Hedeen, Ph.D., for a consultative psychological examination. [R168-74]. She alleged back and leg pain and difficulty thinking and remembering due to depression. [R168]. Plaintiff reported learning problems and special education speech services in second grade. [*Id.*]. She reported she left school in the eleventh grade because she was pregnant. [*Id.*]. Plaintiff reported she lived with five of her six children and two grandsons. [R169]. She claimed that she needed assistance dressing, getting out of the bathtub, and performing household chores, but she reported she used public transportation and shopped for the younger children. [*Id.*]. Plaintiff also reported she handled the finances. [*Id.*]. She alleged concentration problems and relationship problems with her family. [*Id.*]. She also claimed she had no social activities and watched television all day. [*Id.*].

---

[6] A GAF of 40 indicated some impairment in reality testing or communication (e.g., speech at times is illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing school. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th Ed. Text Rev. 2000).

AO 72A
(Rev.8/8
2)

Dr. Hedeen administered the Wechsler Adult Intelligence Scale- III (WAIS-III) to Plaintiff, resulting in a verbal IQ score of 51, a performance IQ score of 54, and a full scale IQ score of 48. [R170]. Dr. Hedeen noted that the scores "were below estimated premorbid abilities in the Borderline range." [*Id*]. Dr. Hedeen also noted that the scores "were inconsistent with usual adaptive functioning and reported educational history." [*Id*.]. Dr. Hedeen further noted:

> [Plaintiff[7]] exerted variable effort during tests, displayed poor attention, and this performance was much below adaptive functioning level. In addition, reported educational and adaptive functioning history was well above mental status and test results. [Plaintiff's] behavior indicated exaggeration of problems in the mental status exam and test results. The test results were interpreted as unreliable and invalid estimates of current psychological functioning, well below true abilities.

[R171]. Dr. Hedeen's diagnosis was depressive disorder, although she noted she could not confirm the diagnosis in part because "mental status indicated exaggeration of problems." [*Id*.]. Dr. Hedeen also noted "[t]est results were an underestimate of usual intellectual, perceptual-motor, and academic functioning. [Plaintiff] displayed poor attention and did not consistently try to determine the answers." [*Id*.]. Dr. Hedeen indicated that Plaintiff had some problems affecting her task completion and other

---

[7] Dr. Hedeen appears to have inadvertently listed Plaintiff's name as "Ms. Swann" in her report. [R171].

AO 72A
(Rev.8/8
2)

work-related behavior.  [*Id*.].  Dr. Hedeen opined that Plaintiff experienced chronic problems, which affected task completion and other work related behavior.  [*Id*.]. However, with resolution of her depression, Dr. Hedeen felt Plaintiff could be a good candidate for vocational services.  [*Id*.].

On April 30, 2001, Plaintiff was seen at South Central Mental Health for complaints of insomnia.  [R530].  Plaintiff was again seen at South Central Mental Health on May 14, 2001,  with complaints of auditory hallucinations. [R529].

On June 12, 2001, Plaintiff underwent a consultative psychological examination with Dr. Russell Brown.  [R587-88].  Plaintiff reported she went to the eleventh grade and lived with her four children and two grandchildren.  [*Id*.].  Dr. Brown noted that Plaintiff's affect was flattened, but her speech was normal; her thought processes logical, goal oriented, and reality based, with no evidence of any perceptual distortions; her insight and judgment were adequate; and she was fully oriented.  [R588].  Dr. Brown noted that Plaintiff was able to register three out of three words immediately but could recall only one word after an intervening task.  [*Id*.].  He also noted she had difficulty spelling words and some difficulty following a three-step command, but her naming functions were intact, her repetition was fine, she was able to construct a sentence without difficulty, and her visuo-spatial functions were

9

adequate. [*Id*.]. Dr. Brown's impression was history of spina bifida and history of depression, possible schizo-affective disorder. [*Id*.]. Dr. Brown noted that cognitively Plaintiff was fully oriented, although she had some trouble with her short-term memory and concentration. [*Id*.]. He opined that Plaintiff may have difficulty remembering and following more complex tasks and some difficulty interacting with the public. [*Id*.]. He further opined that she appeared to be able to adhere to a work schedule but may have some difficulty meeting productions norms because of her complaints of pain. [*Id*.].

On July 10, 2001, Thomas Unger, M.D., a state agency medical consultant, completed a 12.04 Affective Disorder listing form concerning Plaintiff. [R573-86]. Dr. Unger found that Plaintiff had a disturbance of mood, accompanied by a full or partial manic depressive syndrome, as evidenced by sleep disturbances, decreased energy, difficulty concentrating or thinking, or hallucinations. [R576]. The impairment was listed as major depressive disorder with psychotic features. [*Id*.].

The 12.05 Mental Retardation listing form, also completed by Dr. Unger, indicated that the plaintiff had limited intellectual functioning and probable Borderline Intellectual Functioning. [R577].

AO 72A
(Rev.8/8
2)

According to Dr. Unger, Plaintiff had a moderate to marked degree of limitation in activities of daily living; a moderate degree of limitation in maintaining social functioning; and a moderate degree of limitation in maintaining concentration, persistence or pace. [R583].

On November 14, 2001, Plaintiff was seen at South Central Mental Health due to depressive symptoms, crying daily, sad mood, poor concentration, irritability, and problems with sleeping. [R533].

On August 8, 2002, September 6, 2002, and December 30, 2002, Plaintiff was seen at Clifton Springs due to depression. [R308-10].

Plaintiff was seen at Clifton Springs on January 31, 2003, with complaints of having insomnia 5 times a week due to back pain and depression. [R307]. Plaintiff stated that she had crying spells at least 5-6 times a month. [*Id*.]. She reported no visual hallucinations, but audio hallucinations at least twice a week. [*Id*.].

On July 29, 2003, Plaintiff was seen at Clifton Springs for psychotic symptoms and complaints of audio hallucinations, and depressive symptoms of sadness, crying spells, anxiety, and insomnia. [R328]. The diagnosis was reported as Recurrent Major depression. [R332].

AO 72A
(Rev.8/8
2)

Plaintiff continued to be seen at Clifton Springs on January 16, 2004, May 4, 2004, and November 3, 2004, for depressive mood/ psychotic symptoms. [R270-81].

On March 31, 2005, Plaintiff was seen by Dr. Margo King for a consultative examination. [R341-51]. Plaintiff reported she was living with one son and her other five children were living elsewhere. [R341]. She reported she had been receiving SSI for over a year due to a diagnosis of spina bifida. [*Id*.]. Plaintiff reported she dropped out of school in the eleventh grade and alleged she was in special education classes all throughout school and received special training for speech. [*Id*.]. She reported she enjoyed working at day-cares and forming hairstyles on people. [*Id*.]. Plaintiff also reported that she had no friends, had difficulties with her family, and stayed to herself at home watching television, listening to music, and lying down. [R342-43].

Dr. King indicated that Plaintiff was oriented to person, place, time, and situation; understood what she was asked to do; and was able to maintain the attention and concentration needed to complete the assessment. [R343]. Dr. King noted that Plaintiff had a flat affect and depressed mood and her speech was inarticulate, but with an appropriate rate. [*Id*.]. Dr. King indicated Plaintiff put forth her best effort and the test results were considered a valid estimate of her current cognitive functioning. [*Id*.].

12

AO 72A
(Rev.8/8
2)

Testing using the WAIS-III resulted in a verbal IQ score of 57, a performance IQ score of 56, and a full scale IQ score of 52. [*Id*.]. In evaluating the scores, Dr. King stated:

> A diagnosis of mental retardation would be premature and would not be warranted due to her being in special education classes all throughout school and not having employment opportunities where her school-learned skills were required. [Plaintiff] has also been out of school a number of years which contributes to her lowered scores. The scores rendered should be considered to be a reliable and accurate estimate of [Plaintiff's] abilities and should be considered valid in regards to her performance. The results of this measure are also consistent with [Plaintiff's] reports of being in special education classes all throughout school.

[R344]. Dr. King also noted achievement functioning testing indicated Plaintiff was functioning at a second grade level and was consistent with Plaintiff's reported difficulties, her performance on the WAIS-III, and her reported special education classes all throughout school. [R344-45]. Dr. King stated that the scores should be considered a valid and accurate estimate of her academic achievement based on the number of years of school she completed and the number of years she had been out of school and used any of her learned knowledge from the classroom. [R345]. Dr. King noted adaptive functioning testing indicated Plaintiff was functioning in the extremely low range, but it appeared Plaintiff may have been under-reporting her true abilities as a cry for help. [R345-46]. Dr. King diagnosed Plaintiff with major depressive disorder,

AO 72A
(Rev.8/8
2)

mild retardation (upper level) to borderline intellectual functioning, and problems with home environment. [R347-48].

Dr. King also completed a Medical Assessment of Ability to Do Work Related Activities (Mental) form. [R349-51]. According to Dr. King, Plaintiff's ability to deal with work stresses was poor; she had low motivation affecting concentration/ attention; her ability to understand, remember and carry out complex job instructions was poor; her ability to understand, remember and carry out detailed, but not complex job instructions was poor; and she forget things easily due to low concentration and attention. [R349-50]. Additionally, Plaintiff experiencing difficulty in various word comprehensions. [R350]. According to Dr. King, Plaintiff demonstrated a flat affect due to depressed symptoms and might not be reliable to show motivation to attend any responsibilities. [*Id.*]. Dr. King also reported that Plaintiff had low motivation/concentration/attention due to depressed symptoms and reported physical limitations. [*Id.*].

On September 12, 2005, Plaintiff underwent a consultative psychiatric examination with Dr. Bruce Prince. [R352-58]. Plaintiff reported she took care of her personal needs and watched television, but claimed her son and other children helped with household chores, shopping, and food preparation. [R353]. Plaintiff claimed she

14

could not read or write, needed help from her daughters to pay bills, and was capable of making small change only. [*Id*.]. She reported she was able to take the bus. [*Id*.]. She also reported she attended school until the eleventh grade in special education. [*Id*.]. Dr. Prince noted that Plaintiff had a constricted affect, a depressed mood, and was fully oriented, but was only capable of the simplest addition and subtraction. [R354]. Dr. Prince diagnosed Plaintiff with major depression and mental retardation. [*Id*.]. Dr. Prince opined that Plaintiff appeared to have limited cognitive capacity and required help from others to meet some of the demands of daily life. [*Id*.]. He opined that Plaintiff's prognosis was "quite guarded." [*Id*.].

Dr. Prince also completed a Medical Assessment of Ability to do Work Related Activities (Mental). [R356-58]. On this form, Dr. Prince concluded that Plaintiff's ability to relate to co-workers was poor, her ability to interact with supervisors was poor, her ability to deal with work stresses was poor, and her ability to maintain attention/concentration was poor. [R356]. He also opined that Plaintiff's ability to behave in an emotionally stable manner was poor, her ability to relate predictably in social situations was poor, and her ability to demonstrate reliability was poor. [R357].

AO 72A
(Rev.8/8
2)

On November 3, 2005, Plaintiff was seen at Clifton Springs due to reports of having some depressive symptoms due to a family member's death, hearing voices daily, and problems with sleeping. [R394].

Plaintiff was next seen at Clifton Springs on May 1, 2006, due to auditory hallucinations, depressed mood, and anxiety. [R369]. Plaintiff was again seen at Clifton Springs on May 26, 2006, due to depressive mood/psychotic symptoms and spina bifida. [R365]. On June 29, 2006, Plaintiff complained of having depressive symptoms and hearing voices. [R557]. The same symptoms were reported on September 11 and October 25, 2006. [R550]. Plaintiff was again seen at Clifton Springs on April 27, 2007, for depression and psychosis with auditory hallucinations. [R545-47].

D.    *Evidentiary Hearing Before The ALJ*

Plaintiff was 43 years old at the time of the December 2006 hearing. She testified that she is single and has six children. [R697]. Plaintiff went to school through the eleventh grade and does not have a GED. [R699-700]. Plaintiff also testified that she last worked in a day care in 1998. [R701]. She explained that she stopped working because "[m]y back went out at that time." [*Id.*].

AO 72A
(Rev.8/8
2)

Plaintiff further testified that she feels depressed and "be crying a lot." [R707]. She also testified that she stopped working because of her pain in her lower back and because she was "a little depressed." [R708].

Plaintiff testified that she cries a lot for no reason and that she "be hearing like-like sounds like (inaudible) or something like that." [R710]. Plaintiff further testified that she went to the psychiatrist because she believed her mind was "playing tricks" on her. [*Id*.].

The vocation expert ("VE") testified that Plaintiff's past relevant work was as a house cleaner, which is light, unskilled work; a packer, which is medium, unskilled work; mail sorter, which is light, unskilled work; garment hanger, which is light, unskilled work; and day care worker, which is medium unskilled work. [R717]. The VE testified that Plaintiff would have no transferable skills. [*Id*.].

The ALJ posed five hypothetical questions to the VE. He first asked whether a hypothetical person who was capable of lifting and carrying up to 50 pounds occasionally, standing or walking at least six hours in an eight hour day and capable of medium work would be able to perform Plaintiff's past relevant work. [R717]. The VE responded that such a person could perform Plaintiff's past relevant work. [*Id*.].

17

The ALJ then inquired whether a hypothetical person with the residual functional capacity to lift and carry up to twenty pounds occasionally and less amounts more frequently and could stand or walk for six hours out of an eight hour day and capable of light work could perform Plaintiff's past relevant work. The VE responded that such a person could not perform the jobs of house cleaner, mail sorter, and garment hanger. [R717-718].

The ALJ next inquired as to whether the identified light jobs have an alternate change between standing, sitting and walking. The VE responded that the identified jobs did not readily afford the changing of posture. [R718]. The ALJ then inquired whether there were light jobs that involved a change of position from sitting to standing to walking. The ALJ replied that such a hypothetical person could perform the jobs of assembler of plumbing hardware and electronics works. [R718-719].

The ALJ then inquired whether there were any jobs at the sedentary level that accommodated a change in position. The VE replied that such a hypothetical individual could perform the jobs of final assembler and bench hand. [R719].

Finally, the ALJ inquired as to whether a hypothetical individual with unresolved depressive syndromes which included crying unpredictably, inability to focus on work with the end result being that they could not meet the criteria of the job be precluded

AO 72A
(Rev.8/8
2)

from the jobs discussed.  The VE responded that such a person would be precluded from working.  [R720].

On cross-examination, the VE testified that a hypothetical person of Plaintiff's age, education, and past work experience who is limited to lifting ten pounds occasionally; five pounds frequently; limited to standing or walking no more than thirty minutes at a time; who needs a sit/stand option; who should avoid bending, stooping, crouching, crawling, and ladders; and who has a poor ability to tolerate work stresses; and frequent inability to maintain attention, concentration, persistence and pace would not be able to perform any work at any position.  [R720-721].

The VE further testified on cross-examination that if such a hypothetical person had occasional interference with her ability to attend and concentrate, then such an individual could still not perform any work.  [R721].

## IV.  ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact:

1.  The claimant has not engaged in substantial gainful activity since January 5, 1999, the application date (20 CFR 416.920(b) and 416.971, *et seq*.).

2.  During the relevant period, the claimant had a depressive disorder and Spondylolisthesis at L5-S1, impairments that are severe within the meaning of the regulations (20 CFR 416.920(c)).

19

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. During the relevant period, Plaintiff had the residual functional capacity ("RFC") to perform medium work involving simple, routine, repetitive tasks.

5. The claimant is able to perform her past relevant work (20 CFR 416.965).

6. The claimant is not under a disability, as defined in the Social Security Act, from January 5, 1999, through February 8, 2001, the day before she was found disabled by the State Disability Determination Service (20 CFR 416.920(g)).

[R322-28].

The ALJ determined that Plaintiff was not disabled at any relevant time prior to his decision. [R28]. In making this determination, the ALJ first summarized Plaintiff's mental health records. [R23-24]. He then discussed Plaintiff's mental impairment. [R24-25].

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that claimant's statements concerning the intensity, persistence and limiting effects of the symptoms were not entirely credible. [R27].

20

The ALJ noted that Plaintiff alleged that she was unable to work due to depression, but her treatment was routine and conservative in nature. [R27]. The ALJ also observed that Dr. King felt Plaintiff would benefit from volunteer work and helping others, which indicated that she was capable of making adjustments to work-like activities, and therefore her depression was not as disabling as alleged. [*Id.*].

The ALJ also noted that he gave considerable weight to the opinion of Dr. Brown because his opinion was "well reasoned, consistent with other medical information in the record and fully supported by DeKalb Community Service Board treatment records," which showed generally routine treatment and medication maintenance. [*Id.*]. The ALJ also noted that he gave substantial weight to Dr. King's opinion regarding Plaintiff's ability to perform volunteer work as her opinion was consistent with Dr. Brown's and Plaintiff's treatment notes. [*Id.*]. Finally, the ALJ gave little weight to the opinion of Dr. Prince since the severity of Plaintiff's condition outlined in his report was not supported by Plaintiff's treatment history and the opinions of Drs. Brown and King. [*Id.*].

The ALJ observed that the VE found that an individual with Plaintiff's background and RFC could perform her past relevant work and other work that existed in the national economy. [R28]. The ALJ also observed that, even assuming Plaintiff

21

could not perform her past relevant work, the VE identified other work in the national economy which she could perform that allowed for sitting, standing, or other change of position.  [*Id*.].  As a result, the ALJ found that Plaintiff was not disabled at any time after her alleged onset date because she could perform other jobs in the national economy.  [*Id.*].

## V.       STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3).

AO 72A
(Rev.8/8
2)

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. § 404.1512(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. § 404.1520(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that she is not undertaking substantial gainful activity. *See* 20 C.F.R. § 404.1520(b). At step two, the claimant must prove that she is suffering from a severe impairment or combination of impairments which significantly limits her ability to perform basic work-related activities. *See* 20 C.F.R. § 404.1520(c). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education and work experience. *See* 20 C.F.R. § 404.1520(d). At step four, if the claimant is unable to prove the existence of a listed impairment, she must prove that the impairment prevents performance of past relevant work. *See* 20 C.F.R. § 404.1520(e). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education and past work

23

AO 72A
(Rev.8/8
2)

experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. § 404.1520(f). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Doughty*, 245 F.3d at 1278 n.2.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a) and 416.920(a). Despite the shifting of burdens at step five, the overall burden rests upon the claimant to prove that she is unable to engage in any substantial gainful activity that exists in the national economy. *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

## VI.    SCOPE OF JUDICIAL REVIEW

The scope of judicial review of a denial of Social Security benefits by the Commissioner is limited. Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).

24

This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. If supported by substantial evidence and proper legal standards were applied, the findings of the Commissioner are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). "Substantial evidence" means more than a scintilla, but less than a preponderance. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

AO 72A
(Rev.8/8
2)

## VII.  ANALYSIS OF CLAIM OF ERROR

Plaintiff argues that the ALJ erred in concluding that she did not meet the mental retardation listing of 12.05 C since four psychologists found that she had low IQ scores in addition to the physical impairment of spondylolthesis and the mental impairment of a depressive disorder.  [Doc. 11 at 16-18].  Plaintiff also argues that the evidence points to Plaintiff being mentally retarded prior to age 22 because she was in special education classes and received failing grades in school.  [R17].

The Commissioner responds that the ALJ did not err in finding that Plaintiff did not meet Listing 12.05 C because Plaintiff failed to prove that her impairments met the threshold requirement of the diagnostic description of mental retardation of the Listing in that the evidence does  not show that Plaintiff had deficits in adaptive functioning during the developmental period.  [Doc. 12 at 17-2].  The Commissioner also responds the record does not include valid IQ scores for the purposes of the listing.  [*Id*. at 21-23].

Under Listing 12.05:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1. § 12.05C. The introduction to mental disorders in Appendix 1 of subpart P explains:

If your [intellectual] impairment satisfies the diagnostic description in the introductory paragraph [of Listing 12.05] and any one of the four sets of criteria, we will find that your impairment meets the listing. . . For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, *i.e.*, is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) impose "an additional and significant work related limitation of function," even if you are unable to do your past work because of the unique features of that work.

20 C.F.R. Pt. 404, Subpt. P, App. 1. § 12.00A. Thus, Plaintiff needed to prove that she had: (1) a significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; (2) an IQ score between 60 and 70; and (3) other physical or mental impairments, which imposed

27

significant work-related limitations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. §§ 12.00A, 12.05C.

The Court concludes that substantial evidence supports the ALJ's decision that Plaintiff did not meet Listing 12.05C.[8] Initially, the Court notes that the ALJ did not specifically state how Plaintiff's impairments failed to meet the criteria of Listing 12.05C. However, "it is not required that the [Commissioner] mechanically recite the evidence leading to h[is] determination. There may be an implied finding that a claimant does not meet a listing." *Keane v. Comm'r of Soc. Sec.*, 205 Fed. Appx. 748, 750 (11th Cir. 2006) (citing *Hutchison v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986)). For the reasons discussed below, the ALJ properly evaluated the medical evidence in determining that Plaintiff did not meet Listing 12.05C.

The record does not show that Plaintiff suffered from mental retardation prior to age 22. To establish mental retardation, there must be evidence of "significantly subaverage general intellectual functioning with deficits in adaptive functioning

---

[8]    In his opinion, the ALJ states that Plaintiff's mental impairment does not meet or medically equal listing "12.04," which refers to affective disorders, not mental retardation. [R24; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. § 12.04]. However, the ALJ then goes on to describe why Plaintiff does not meet the mental retardation listing. [R24-25]. Because neither Plaintiff nor the Commissioner addressed the ALJ's reference to § 12.04 rather than § 12.05, the Court assumes this was an inadvertent error on the ALJ's part and the ALJ was actually referring to Listing 12.05 in his opinion.

AO 72A
(Rev.8/8
2)

initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. Moreover, the results of an IQ test create a rebuttable presumption that mental retardation developed before the age of 22. *Hodges v. Barnhart*, 276 F.3d 1265, 1267 (11th Cir. 2001). The ALJ does not have to make a finding of mental retardation based solely on the results of an IQ test. *See Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986); *see also Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992). Instead, the ALJ should consider the IQ test results along with medical reports and other evidence in the record, including daily activities, behavior, past work and academic experience. *Popp*, 779 F.2d at 1499; *see also Hodges*, 276 F.3d at 1269.

Here, four psychologists (Drs. Hedeen, Emory, King, and Prince) found that Plaintiff had IQ scores in the 50's, which indicates the extremely low range of intellectual functioning. In addition, Plaintiff advised several of the examining psychologists that she had been in special education classes while she was in school. [R168, 342, 352]. However, Plaintiff's school records show that she was in regular classes, not special education classes. [R126-27, 229]. Additionally, there is no indication anywhere in the record that Plaintiff left school due to her grades. Rather, Plaintiff has repeatedly stated that she left school in the eleventh grade because she was

AO 72A
(Rev.8/8
2)

pregnant. *See Whetstone v. Barnhart*, 263 F. Supp. 2d 1318, 1325 (M.D. Ala. 2003) (determining that claimant had left school in the ninth grade due to pregnancy, not poor academic performance). The ALJ noted that Plaintiff is capable of caring for herself and her grandchildren, that she has a driver's license, and that she stopped working mostly because her back was hurting. [R24, 26, 699]. Plaintiff further testified that she received some nursing training, but did not complete the course work because she was pregnant. [R26, 700-701]. Plaintiff also testified that she was employed for a year and a half at a day care without any attendance problems before she quit due to pain and depression. [R26, 229, 709]. Finally, the ALJ noted that Dr. King opined that Plaintiff would benefit for volunteer work and helping others, which indicated that she was capable of making adjustments to work-like activities. [R27]. Accordingly, the evidence supports the ALJ's implicit decision to reject Plaintiff's IQ scores. *See Battle v. Astrue*, 243 Fed. Appx. 514, 519-21 (11th Cir. 2007) (finding that the ALJ did not err in his evaluation of claimant's IQ scores when he did not specifically reject the IQ score, mention the 12.05 Listing, or explain why the Listing was not met, but properly discussed the medical evidence).

Even assuming Plaintiff could show that she had deficits in adaptive functioning which manifested prior to age 22, she still cannot show that she meets the requirements

30

of Listing 12.05C, because substantial evidence supports the ALJ's determination that Plaintiff does not suffer from mental retardation. First, the ALJ incorporated his February 8, 2001, opinion into his July 23, 2007, opinion. [R23]. In the 2001 opinion, the ALJ pointed out that Dr. Hedeen did not consider Plaintiff's IQ's scores to be valid. [R229]. The ALJ correctly noted that Dr. Hedeen evaluated Plaintiff's IQ as being in the extremely low range, but that there was evidence that Plaintiff exaggerated her problems, and therefore, Dr. Hedeen recommended that one "use caution when determining limitations stemming from claimant's impairments." [R173, 229].

Second, the ALJ noted that Dr. Brown's opinion was entitled to significant weight because his opinion was "well-reasoned, consistent with the other medical information of record, and fully supported DeKalb Community Service Board treatment records. . . ." [R27]. Dr. Brown opined that Plaintiff's thought processes were logical, goal directed and reality based, but that she had trouble with short-term memory and concentration, had difficulty with remembering and following complex tasks, and difficulty interacting with the public. [R588]. Dr. Brown also opined that Plaintiff appeared to be able to adhere to a work schedule, but could have difficulty meeting production norms due to her complaints of chronic pain. [*Id.*]. This assessment is consistent with (1) Plaintiff's mental health records, which show that most of Plaintiff's

31

problems related to difficulty with her children rather than intellectual impairments, [R107-18, 175-95]; (2) Dr. King's assessment that Plaintiff could perform volunteer work; and (3) Dr. Hedeen's assessment that Plaintiff's IQ test scores were invalid due to poor effort. Thus, the ALJ did not err in giving substantial to the opinion of Dr. Brown regarding Plaintiff's abilities.

Third, the ALJ correctly noted that the psychiatric evaluations of Drs. King and Brown did not reflect significant difficulty in Plaintiff's activities of daily living. [R24]. The evidence shows that during the relevant time period, Plaintiff could dress herself, do household chores, take medication independently, shop for her grandchildren, and handle her finances. [R169, 353]. The ALJ also noted that Plaintiff had only mild restrictions in social functioning and that this assessment was supported by Dr. King, who felt that Plaintiff would benefit from volunteer work and helping others. [*Id*.]. Therefore, the ALJ properly credited Dr. King's opinion to the extent that she determined that Plaintiff was capable of performing volunteer work as it was consistent with Dr. Brown's opinion. [R27].

Fourth, the ALJ properly discounted Dr. King's assessment that Plaintiff's IQ tests were valid as inconsistent with Dr. Brown's opinion and other treatment records. [*Id*.]. For example, as discussed above, Dr. Hedeen opined that Plaintiff's

scores were invalid because she exaggerated her symptoms, [R171], and Dr. Brown, who found Plaintiff's mental status to be adequate. [R588]. In addition, although Dr. King found Plaintiff's IQ tests scores to be reliable, she also stated that a diagnosis of mental retardation was premature because Plaintiff had been out of school a number of years, which contributed to her low scores. [R344]. Dr King further opined that Plaintiff was under-reporting her true abilities "as a cry for help and her attempt to portray the depressive symptoms." [R346]. Thus, the ALJ properly rejected Dr. King's opinion that Plaintiff's IQ scores were valid. *See Outlaw v. Barnhart*, 197 Fed. Appx. 825, 827 (11th Cir. 2006) (finding that substantial evidence supported the ALJ's conclusion that claimant was not disabled under Listing 12.05C, because (1) his IQ adult scores were inconsistent with his daily activities and work history and (2) two psychologists concluded that he functioned in the borderline range of intellectual functioning); *see also Wainwright v. Comm'r of Soc. Sec.*, No. 06-15638, 2007 WL 708971, *2 (11th Cir. March 9, 2007) (finding that the ALJ was entitled to reject the examining psychologist opinion because "his opinion was contrary to the opinions and assessments of the other state agency psychologists").

Finally, the ALJ properly discounted the opinion of Dr. Prince because his opinion was not supported by his treatment notes concerning Plaintiff and the opinions

33

of Drs. Brown and King. [R27]. Dr. Prince determined that Plaintiff suffered mental retardation based on her IQ scores from previous examinations and her self-reported history. [R352-54]. However, as previously discussed, neither Dr. Hedeen nor Dr. King, who administered Plaintiff's IQ tests, determined that Plaintiff suffered from mental retardation. [*See* R171, 344]. Additionally, Plaintiff made inconsistent statements to Dr. Prince about her abilities. For instance, she advised Dr. Prince that she could not read or write and required the assistance of her daughters to pay the bills, [R353], yet told Dr. Hedeen that she handled her finances and bought money orders in order to pay her bills. [R169]. Therefore, because Dr. Prince's assessment that Plaintiff suffers from mental retardation is not supported by the record, the ALJ did not err in giving little weight to Dr. Prince's opinion. *See Fries v. Comm'r of Soc. Sec. Admin.*, 196 Fed. Appx. 827, 833 (11th Cir. 2006) ("The ALJ had good cause for giving minimal weight to Dr. Pisciotto's original opinion that Fries was totally disabled because Pisciotto's original opinion was inconsistent with other evidence in the record, including the opinions of Drs. Seo, Funk, and Marrone, and Fries's own description of her daily activities.").

AO 72A
(Rev.8/8
2)

The record as a whole contains substantial evidence that the ALJ properly evaluated the medical evidence under Listing 12.05C.[9]   Accordingly, the Commissioner's decision is **AFFIRMED** on this claim.

---

[9]    The Court notes that the ALJ does not discuss Dr. Emery's report in his opinion. [R17-29]. The Court concludes that the ALJ's omission of any discussion regarding Dr. Emory's assessment of Plaintiff's condition is harmless error as Dr. Emory's assessment does not support Plaintiff's contention that she is mentally retarded. Instead, despite finding that Plaintiff had low IQ scores, Dr. Emory opined that Plaintiff was capable of some cognitive and vocational rehabilitation. [R130]. Thus, his opinion supports the ALJ's determination that Plaintiff's impairment does not meet the 12.05C mental retardation listing. *See Caldwell v. Barnhart*, 261 Fed. Appx. 188, 190 (11th Cir. 2008) ("We agree with the district court that the ALJ's failure concerning Dr. Bell's opinions was harmless error because the application of Dr. Bell's limitations would not have changed the result."); *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (finding ALJ's mischaracterization of claimant's past work was harmless error, because such characterization of vocational factors was irrelevant where ALJ found no severe impairment); *see also Woodward v. Apfel*, No. 99-0926-RV-L, 2001 WL 102354, *9 (S.D. Ala. Jan. 8, 2001) ("Though it was recommended in the Order on remand . . . that the ALJ consider the staleness of Plaintiff's 1978 IQ testing, he did not address this issue. However, the undersigned finds that it is harmless error. Consideration of the stale IQ test results would only serve to show that Plaintiff did not present evidence of a current IQ test with an IQ score between 60 and 70.").

35

AO 72A
(Rev.8/8
2)

## VIII. CONCLUSION

For the reasons set forth above, the decision of the Commissioner is **AFFIRMED**.

The Clerk is **DIRECTED** to enter judgment for the Commissioner.

**IT IS SO ORDERED and DIRECTED**, this the __9th__ day of February, 2010.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)